# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

**UNITED STATES OF AMERICA**

**v.**

**BRIAN DAY,**

        **Defendant.**

</td><td>

**Case No. 24-CR-167**

</td></tr>
</table>

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF
## PRETRIAL DETENTION OF DEFENDANT BRIAN DAY

The United States of America, by and through its undersigned counsel, respectfully submits this memorandum in support of its motion that Defendant Brian Day be detained pending trial pursuant to Title 18, United States Code, Section 3142(f)(1)(A) (crime of violence).  After a federal grand jury indicted the defendant on one count of Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b), one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), the defendant was arrested on April 10, 2024.  The government requests that this Court consider the following points and authorities, as well as any information presented at the detention hearing, and order Defendant Brian Day detained pending trial.

## Factual Background

### March 2023 to April 2023

On March 7, 2023, a Federal Bureau of Investigation Task Force Officer was acting in an undercover (hereinafter "UC") capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation (MPD-FBI) Child Exploitation Task Force, operating out of a satellite office in Washington, D.C. The UC had been a member of a dating website, referred herein as WEBSITE A, for over a year. The UC has a profile posted on WEBSITE A, where users will

contact the UC directly based on the content of the UC's profile. In the WEBSITE A profile, the UC posed as the "taboo dad" to a purported 11-year-old son. Different areas of WEBSITE A are known to the UC as places where people meet, discuss, and trade images and videos depicting the sexual abuse of children and links containing child pornography, among other things. On March 7, 2023, a user with the screenname "bbbttm73" contacted the UC via direct message through WEBSITE A. As discussed below, user "bbbttm73" was subsequently identified as Brian Samuel Day (the defendant). The defendant sent the following introductory message to the UC, "Total perv/taboo pig here with pretty much no limits. No min age limit and don't care if it's forced. Prefer it sometimes, actually. What about you? You say you're a tabu dad. That mean what I think it does? If so, my cock just twitched at the thought."

The defendant later told the UC that he uses the messaging application Telegram[1] to chat. The defendant provided the UC his Telegram screenname "pervboy78" and told the UC to contact him via Telegram. On March 7, 2023, the UC and the defendant began communicating through Telegram.

On March 7, 2023, the following messages were exchanged between the UC and the defendant through Telegram as they discussed the UC's purported 11-year-old son, and the defendant expressed a desire to receive images depicting the purported child:

> pervboy78: Do you two play at all
> UC: Here and there. I spy and sneak pics
> UC: Sometimes play now, I train him
> pervboy78: And yeah, no min age limit here either
> pervboy78: Oh fuck. What do you do?
> UC: No limit here
> UC: Used to play with mine all the time when he was a baby
> pervboy78: Fuck yeah. Do you still play tho? Anything?.
> UC: I do. When I can.
> UC: He's a bit pickier now that he's older

---

[1] Telegram is a communication application that utilizes end-to-end encryption.

pervboy78: I would fuckin love to see a pic or two you've sneakily taken of him.
UC: I might have some stuff
pervboy78: A bit pickier about what?
UC: Can't just fuck him whenever I want now
pervboy78: Oh shit. So you fuck him? I take it it's not forced? You think he's gay or just giving his dad what he wants?

Later that day, the defendant sent the following message, again expressing his desire to receive images of who he believed to be an 11-year-old boy, and also stating that he had received sexually explicit images of children in the past:

pervboy78: And if you were so inclined, I would absolutely love it if you were to send me a pic or two of him.
pervboy78: I keep running into dads who share with me what they do with their sons and get me all worked up by saying they'd like to give me my first experience only to all of a sudden just drop off the chat and delete their profile. So now I'm always a little leery that the 'dad' I'm talking to is legit a pervy dad with a son he plays with or just some guy who likes to talk to other guys about it so they can jerk off and never be seen again
pervboy78: Because they all said they had pics and/or vids of their son but would never send me anything. I'm not saying face had to be in it. It doesn't. But I've only had 1 dad send me pics and he was in Mexico with 2 adopted boys. The pics were hot and he even invited me down to Mexico to play with him and his sons and his brother and his brother's son. But he too stopped talking.

Later that same day, the conversation between the UC and the defendant continued:

UC: Love to see what he sent you
pervboy78: That's not amazing. lol Not anymore. I'm at the point now where I don't even want to talk to someone who hits me up on here who isn't local or can provide me an opportunity for an experience. I don't enjoy just talking about it. I'll be 50 this year and I'm so over just talking about it. Dammit, I want to have an experience. Hell, even if I just watched I'd take that over hearing one more guy tell me that he's had an experience or two. I'm seriously thinking about just letting this all go and focus on something that's actually attainable. Cuz I'm tired of talking about it, hearing other's stories they have, being told I'll get an experience soon with them, only to have them all just disappear.

The defendant repeatedly told the UC that he truly wanted to sexually abuse a minor child, stating, "I am the real deal here and not just full of talk."

Later the same day, the defendant sent the following messages, expressing a desire to receive sexually explicit images of a minor, and offering to share access to and/or display his collection of child pornography with the UC:

> pervboy78: It's not that I don't want to send it [child pornography] but I would feel more comfortable getting a pic that's a little more explicit than that. And it doesn't have to be your son. I totally get that.
> pervboy78: And I respect you for not wanting to send anything more explicit of him until you felt more comfortable with me. I'm happy to get together and watch the hundreds of real pervy vids on my external hard drive with you.

As the chat continued, the defendant repeatedly wrote statements offering to display and share child pornography with the UC:

> pervboy78: Some of the vids will make your jaw drop they're so hot

The same day, the defendant sent the following message:

> pervboy78: And I'm gonna have to just wait until we get together (if you're down for that) to show you my cache cuz I don't have anything as tame as what you've sent me. I want to feel like we're on equal footing on what we've sent. Cuz technically, you haven't sent me anything that would get you in trouble if seen whereas my pics are most definitely the kind that would get me into instant trouble. If that makes sense.

As the conversation between the UC and the defendant continued, it went:

> UC: I prefer to share original content with other parents I meet
> pervboy78: I'd rather we just watch in person, together. Use my external hard drive and not be connected to the internet while we watch it

The conversation continued to go on:

> UC: And would rather have trust before meeting anyone
> UC: Someone who says they have an external full of stuff that wants to meet makes me a bit hesitant because it feels risky. I'm trying to meet up with someone I can trust who is interested in play with mine
> pervboy78: Ok. I thought having the vids on an external hard drive meant it was less risky but I will take your word that it's more risky. At least for or to you. I want nothing more in the world than to meet a dad who is willing to share his son with me, even in the slightest way possible. I wish there was a wa[y] that I could show you that I am completely harmless guy. Just an average middle aged white gay guy, who just so happens to be down on his luck lately, who wants to befriend a dad who will eventually let me play with him first then him and his son.

pervboy78: Is there anything I can do right now or in general to start down that path of proving to you I am trustworthy and def not a lunatic or a serial killer. lol But I guess a lunatic or serial killer would say they weren't one, wouldn't they? Well fuck, I don't know what to do. I could give you my profile name for all the different apps/websites I'm on to go check out and see how normal I am. Well, normal is a very subjective term. Lol

Later in the conversation, the following text exchange occurred:

UC: FYI my thing is to watch someone play with him to see if I trained him well enough. Kind of a test of me to see if he can satisfy someone else
pervboy78: I think that's the hottest fuckin message I've ever read from someone. Ever!! Holy shit!
pervboy78: Play with him how? What have you trained him to be able to do or take or handle?
UC: He's sucked me and I've fingered him, sucked him a bit, and fucked him a little.
pervboy78: He have a nice size cock for his age? Does he 'cum' yet? And has he taken you balls deep? Have you bred him? Sorry for all the questions but now I'm visualizing. And I don't even know what you look like! lol

The conversation went on:

pervboy78:  I bet hes close to cumming too. I'd love it if like one of the first times he actually came was when he was fucking me. My ultimate fantasy is to be bred by a 10yo-14yo boy and take his newly created seed. Then return the favor and give him my seed, if that was allowed
pervboy78: I'd love to eat the fuck out of his little pink boy pussy. I'd love to make him moan and feel his cock that got hard while I ate his ass cuz I'm that good at it. I go DEEP with my tongue and it usually drives guys wild. Don't see why he'd be any different
UC: The rules would be no bruises, no blood, and dad has the ultimate say
UC: Love to see cum all over him
pervboy78: Those sound like reasonable and justified rules to me

On March 14, 2023, the defendant continued the conversation with the UC.  The defendant

sent the following message to the UC:

pervboy78: So tell me…what is it I need to personify or represent…or what characteristics do I need to possess in order to look like a good candidate to play with your boy? Because I'm 100% serious about wanting this to happen, I figured I'd ask you what things you're looking for the right guy to possess in order to play with your son. I won't be fake or say things that aren't true just to 'tick' off all the boxes. I feel like you'd see right through that anyway.

That same day, the defendant stated:

pervboy78: But, whatever you want and how it ends up going, forced or not, I would be in line to follow your lead and have no objections.

On March 21, 2023, the defendant sent the UC photographs depicting a white man's face. Those photographs are captured below:

 

Immediately after sending these images, the defendant asked, "Trade some noods?" and then sent several explicit photographs depicting a white adult man's anus and penis.

On March 28, 2023, the defendnat and the UC discussed the potential of the defendant meeting up with the UC in order for the defendant to sexually abuse the purported 11-year-old boy. The defendant wrote in these messages:

pervboy78: And I'd like to throw my hat in the ring as someone to consider having over for your son to pleasure as well as (hopefully) be the first hole he fucks and breeds.

As the Telegram chat continued, the defendant offered to produce child pornography with the UC's purported 11-year-old son, and also offered to receive images depicting the sexual abuse of the boy:

pervboy78: And feel free to video when he and I play. I don't care if my face is in it either
pervboy78: Just send me a copy to watch and jerk off to

> pervboy78: You think he'd be down to play with me? Would you let him know in advance that I was going to come over and play with him or only let him know, like, when I'm on my way there?
>
> pervboy78: Just was curious if he doesn't like me or like the idea of having to pleasure another man whether or not his cock would still get hard to fuck me

The defendant went on to discuss explicitly what he would do with the minor child. Subsequent to that, the defendant, again, specifically asked the UC for an explicit photograph of the purported 11-year-old child, writing:

> pervboy78: Would it be possible to see a cock pic of your boy, if you have one?

The same day, as the UC and the defendant discussing how to prepare the UC's purported 11-year-old son for the sexual abuse the defendant intended to perpetrate against the boy, the defendant sent the following message:

> pervboy78: Making sure he's okay with me, I would maybe bring it up to him this week when you see him. Let him know that while he's with you next week at some point you're gonna have a buddy come over and you him to fuck me and breed[2] me. Ask him if he would do that for daddy.

The defendant continued to direct the UC as to what he should tell his purported 11-year-old son prior to their meeting and in order to prepare the purported child for the sexual abuse:

> pervboy78: And, if it would make it more feasible for him to be comfortable, tell him that daddy would blindfold him and your buddy would come in and take care of him and make sure that he was ready to plunge his young cock balls deep in me and that he could fuck me as hard and long as he wanted. Let him know he'd be in control. Maybe that would make him feel better about it

That same day, the defendant directed the UC to show the purported 11-year-old explicit photographs that the defendant had previously sent to the UC. Several of those photographs

---

[2] "Breeding" is a term known to refer to unprotected sex wherein a male ejaculates inside of another person.

depicted an adult male penis, as well as an adult male anus. The defendant previously told the UC

that those photographs depicted him – Defendant Brian Day:

> pervboy78: Oh yeah, show him some pics of me for sure

The defendant later confirmed that he wanted the UC to show the purported child these sexually

explicit images prior to their meeting, writing:

> pervboy78: You can show him any and all pics you have of me so he will know what he's
> getting when we play

The defendant followed up with the UC:

> pervboy78: Please let me know what he says or how he reacts to my cock pics. Also, how
> he reacts when you tell him that he's going to fuck me and breed me

On March 29, 2023, the defendant wrote to the UC to follow up on his instruction to show

the purported child pictures of his penis and anus:

> pervboy78: I can't wait to hear what you have to tell me your boy says about my pics and
> what you want him to do with me!!

The same day, as the defendant and the UC were discussing a sexual meetup with the

purported 11-year-old boy, the defendant asked:

> pervboy78: How do I know you're for real and not somebody who's gonna be waiting for
> me like he's Chris Hanson from Dateline and I end the day in jail? I'm not saying you're
> giving me those feelings; I only mention it cuz we both have legitimate reasons to be
> worried come the day of. I know, for me personally, that I would be 100% worry free if I
> were to get from you some kind of pic or short vid from your interaction with your son
> tomorrow. And, as a show of good faith, I would send you back something of equal value
> so you could feel comfortable as well come the day of. Make sense?

The defendant did not contact the UC on Thursday, March 30, 2023, the day they had

planned to meet. On April 2, 2023, the defendant asked the UC about meeting up with him and the

purported child on another date:

> pervboy78: And should I keep my Thursday evening clear or Friday? I can keep my Friday
> all day cleared, if necessary

The defendant stated that he would be available on Thursday, April 6, 2023 at 4:00 pm. The defendant later stated that he wished to postpone the meeting because he was awaiting medical test results.

The UC stopped communicating with the defendant on April 6, 2023, and they did not communicate again in 2023.

**Identification of DAY**

A review of the Telegram profile associated with username: "pervboy78" revealed the profile listed his screen name as Brian Beaverhausen, and phone number as 202-XXX-4748. In addition, a photograph of the user was available on the profile page:



On April 12, 2023, an administrative subpoena was sent to WEBSITE A requesting subscriber information associated with the username "bbbttm73." WEBSITE A responded with the following user provided information: email address: calebboy73@yahoo.com, date of birth: September XX, 1973, and location: Washington, D.C.

On April 12, 2023, an administrative subpoena was sent to Verizon requesting subscriber information associated with the phone number 202-XXX-4748. Verizon responded in part, with the following information: Contact name: Brian DAY, contact address: 2745 29th Street, Washington, DC 20008.

On April 13, 2023, an administrative subpoena was served on Yahoo requesting subscriber information associated with the email address: calebboy73@yahoo.com. Yahoo responded to the subpoena providing, in part, that the following user information was associated with this account: recovery email briansday73@gmail.com, and phone number 240-XXX-0585.

On April 14, 2023, an administrative subpoena was sent to Verizon requesting subscriber information associated with the phone number 240-XXX-0585. Verizon responded with the following user provided information: Contact name Brian DAY, contact address: 2745 29th Street, Washington, DC 20008.

On April 14, 2023, an administrative subpoena was sent to Google requesting subscriber information associated with the email address: briansday73@gmail.com. Google responded, providing in part, that the following user information was associated with this account: name: Brian DAY, recovery email: calebboy73@yahoo.com, and phone number: 202-XXX-4748.

On March 15, 2023, using available open source, commercial, and law enforcement sensitive databases investigators were able to identify Brian Samuel DAY, date of birth: 09/XX/1973, home address 2745 29th Street NW, Apartment 600, Washington, DC 20008 (Day's

Woodley Park apartment). Additionally, Defendant Day's driver's license photograph was reviewed by law enforcement. The driver's license photograph appears to depict the same individual as the one depicted in the WEBSITE A profile and the Telegram profile associated with the account used to communicate with the UC as detailed above. Furthermore, it depicts the same individual as the person depicted in images sent to the UC, which are discussed above.  Defendant Day's driver's license photo is depicted below:



As detailed above, Defendant Day was identified as having a birthdate September XX, 1973. On March 7, 2023, Day told the UC he was turning 50 years old this year (in 2023). A birthdate of September XX, 1973 corresponds to Defendant Day turning 50 on September XX, 2023.

The defendant previously communicated to the UC that he resided in the Woodley Park neighborhood of Washington, D.C., near the National Zoo.  On April 20, 2023, law enforcement confirmed with management from Day's apartment building that Defendant Day resided at 2745 29th Street, NW, Apartment 600, Washington, D.C. 20008 (the Woodley Park apartment) and has

resided there since February 2021.  Law enforcement confirmed that Defendant Day was the only leaseholder in the one-bedroom Woodley Park apartment; however, Defendant Day was known to have frequent visitors at the apartment.

**May 2023 to November 2023**

On Wednesday, May 10, 2023, a search warrant was executed on Defendant Brian Day's Woodley Park apartment, a one-bedroom apartment located at 2724 29th Street, NW, Apartment 600, Washington, D.C. The defendant was not present at the residence during the execution of the warrant. During the execution of the warrant, four devices were collected to include an HP laptop, as well as two external hard drives, and a pair of electronic glasses. A forensic extraction of the devices was conducted. A review of the laptop extraction revealed approximately 33 files depicting child sexual abuse material, including the following:

   a. The file identified as "btcomp" is a video file that depicts an adult male inserting his penis in the mouth of a prepubescent boy. The video also depicts an adult male putting his mouth onto the penis of a prepubescent boy.
   b. The file identified as "IMG_9400" is a video file that depicts an adult male putting his penis in the mouth of a prepubescent boy. The video then cuts to the adult male inserting his penis into the prepubescent boy's anus.
   c. The file identified as "12yo boy + man 2 (S)" is a video file that depicts an adult male performing oral sex on a prepubescent boy. The video then cuts to the prepubescent boy strapped to a bed with a cover over his eyes. Then the video shows the same prepubescent boy strapped to the bed with his legs held in the air by additional straps while the adult male performs oral sex on the prepubescent male.

A WEBSITE A account with email calebboy73@yahoo.com was recently accessed on Defendant Day's laptop.  This this the same account and email mentioned above.  Further, a number of other accounts with the registration emails calebboy73@yahoo.com and briansday73@gmail.com were discovered on the defendant's laptop. The laptop did not appear to be owned or utilized by anyone besides Defendant Brian Day.

During the May 10, 2023 search of Defendant Day's Woodley Park apartment, several security cameras were observed throughout the residence. Defendant Day's laptop contained hundreds of media videos, consistent with having come from these security cameras, showing the inside of Defendant Day's Woodley Park apartment and the defendant going about his daily activities within the residence.

In approximately November 2023, law enforcement was notified by the management of Defendant Brian Day's Woodley Park apartment that the defendant had not been paying rent, owed the management company over $18,000.00, and that the management company was making efforts to have the defendant evicted from the residence.

**March 2024**

On March 5, 2024, the same Federal Bureau of Investigation Task Force Officer (UC) was acting in an undercover capacity as part of the Metropolitan Police Department-Federal Bureau of Investigation MPD-FBI CEHTTF, operating out of a satellite office in Washington, D.C. The UC has been a member of a dating website, referred herein as WEBSITE B, for over a year. The UC has a profile posted on WEBSITE B, where users will contact the UC directly based on the content of the UC's profile. In the WEBSITE B profile, the UC posed as the "No Limits Dad." Different areas of WEBSITE B are known to the UC as places where people meet, discuss, and trade images and videos depicting the sexual abuse of children and links containing child pornography, among other things.

At the end of February 2024, a user with the screenname "loveitraw73," later identified as Defendant Brian Day, contacted the UC via direct message through WEBSITE B and sent the following message, "Hey man. I LOVE all things pervy and taboo. Have some real pervy vids to watch with you while I suck you and then have you pound the fuck out of me and breed me deep."

The UC advised the user he was interested in chatting elsewhere and the user forwarded a Telegram username of "@bbprTybttm."

The UC reviewed the profile associated with "loveitraw73" and observed that the account user is a 51-year-old male who is 5 feet, 8 inches tall and 120 pounds, consistent with Defendant Brian Day.

On March 5, 2024, the UC and @bbprTybttm, who has been identified as Defendant Day, began communicating via Telegram. The UC was able to review the profile of @bbprTybttm and observed that two photographs of the defendant were being used for the profile picture of the account. Specifically, one photograph depicted the defendant wearing ripped jeans and a red baseball hat sitting on a piece of furniture.[3]

@bbprTybttm asked the UC, "Was wondering if you had any perv vids you'd like to trade me. What are you into and what are your limits, if any? I have no min age limit and don't care if it's forced. Prefer boys but can tolerate a girl as long as there's also a boy." The UC advised that he had similar interests and indicated that he had "Fun stuff, but I keep it offline because it's original, love to share though."

@bbprTybttm indicated he was interested in seeing the UC's "original fun stuff" and advised that he likes to "smoke and slam[4]" and asked, "Can you host? I cannot. Let me know. I'm down for as soon as you're available." @bbprTybttm advised the UC that he now lives in

---

[3] Defendant Day sent the UC this same photograph in March 2023. It is described and included above.

[4] "Smoking" and "slamming" are terms known to refer to smoking and shooting up crystal methamphetamine.

Southern Maryland, but that he used to live in Washington, D.C. @bbprTybttm reported that he had moved back in with his parents in November 2023 while he tried to get back on his feet.

@bbprTybttm indicated that he would be willing to drive to Washington, D.C. to meet with the UC and advised that he wasn't just a "1:1" guy and that he "have always wanted to be part of a group of pervs who are smokin, slammin, stroking, and if the vibe is there, fuckin, and breedin." @bbprTybttm then advised, "I have no age limits and nothing is off limits regarding the scene . . ."

@bbprTybttm advised the UC, "The one thing that has alluded me, and I would do just about anything to make it happen…is to have an actual adult experience. I hate that most guys have had at least one and I haven't had any. And I spent my entire youth (age 8-16) proving adult men with actual experiences. So now as an adult I'd love to experience that. But I won't have access to any yng ones to make it happen."

The UC alluded to having access to a child amongst his group of "perv friends," and @bbprTybttm advised that he would be extremely discreet if allowed into the group. @bbprTybttm also reported that he would be willing to verify that he is a legitimate "perv" and indicated that he would send the UC "a vid or two so you'll know I'm legit."

The UC advised @bbprTybttm that he has been sexually abusing his brother's 9-year-old stepson and would have access to the child the following week. The UC advised @bbprTybttm that he would have to trust @bbprTybttm fully before they discussed the child's sexual abuse further.

On March 8, 2024, at approximately 4:58 p.m., @bbprTybttm sent the UC a video of a fully nude prepubescent boy laying on a piece of furniture with a black mask covering his face. An adult male is observed nude from the waist up near the boy's genitals wearing a mask to cover

his upper face area. The adult male puts the child's penis into his mouth, and at the same time gropes the child's testicles and anus with his fingers. The child appears to be asleep or unconscious in the video, as he does not react to the sexual abuse while his legs appear limp and easily manipulated by the adult male.

The UC reviewed the video and stated to the defendant, "Too bad lil guy won't remember it . . . I need to remember that angle in the future," and @bbprTybttm responded, "I know!  Well, instead of having the camera in a fixed location, I would happily be your cameraman to help get some great shots and angles . . . And if you didn't, I have full face masks with an opening for the mouth you could wear, if you wanted, while it was being filmed."

The UC advised that he planned to speak to his brother about getting access to his stepson soon, and @bbprTybttm indicated that he would be available Wednesday (March 13, 2024) or Thursday (March 14, 2024) the following week to travel from Southern Maryland into Washington, D.C. to meet the UC and the boy. @bbprTybttm advised he is staying approximately an hour and a half away from Washington, D.C. but would like to stay at the UC's home on Wednesday night so that he could "play all night," indicating that he planned to sexually abuse tht purported child.  @bbprTybttm specifically advised he had a doctor's appointment on Thursday (March 14, 2024) and would want to stay in Washington, D.C. at the UC's home until then.

@bbprTybttm asked the UC what he has done with the boy so far and the UC advised, "I've stroked, licked, and fingered him.  Kissed him with tongue and I've been teaching him how to suck my cock and stroke me . . . I've also rubbed my cock head on his lil pussy and pushed it in a bit." @bbprTybttm asked if the boy had ejaculated yet and the UC indicated he hadn't because he had not hit puberty yet. @bbprTybttm reported, "So as for things I'd like to do . . . I'm perfectly happy just following your lead."

@bbprTybttm asked the UC if they wanted to exchange names and the UC provided his name, and @bbprTybttm reported that his is "Brian." @bbprTybttm advised that he would bring crystal methamphetamine, a water bubbler, and the masks to the UC's home in Washington, D.C.

@bbprTybttm later advised the UC that he had met another "perv" in San Diego who had indicated he had sex with a sixteen-year-old boy who also "slams." @bbprTybttm forwarded a photograph to the UC of an erect penis being held by a hand with the caption, "This is 16 yrs olds dick."

On March 13, 2024, the UC attempted to contact @bbprTybttm to confirm their meeting to engage in sexual acts with the UC's purported 9-year-old stepson. @bbprTybttm did not immediately respond to the UC, but later advised that he had been in Washington, D.C. since Sunday, March 10, 2024, and that his car and phone had been stolen from him, but that they had been since returned. @bbprTybttm stated that he was sorry for not meeting the UC and advised, "I am sstill very mich interested in playing with you and him. It's important to me that you know I am not a flake or someone who can talk the talk but not walk the walk. I just have the shittiest luck out there."

The UC asked @bbprTybttm if he would want to share "#s?" and @bbprTybttm responded, "Yes, let's def do that.  And yes, I have been put thru the ringer in the last week!  My cell is (202) XXX-4748 and I'm Brian." The UC forwarded a phone number to @bbprTybttm and advised, ". . . we met on Grindr if anyone asks."

@bbprTybttm advised, "Got it!  Just sent you a text.  I'm hoping you have some availability this weekend cuz I'd like to hang out, face to face, watch some of your incredibly sexy vids and

maybe have some playtime, whether it's just the 2 of us or we have invited some guests over let me know!"

On Friday, March 22, 2024, the UC asked @bbprTybttm, "Are you game for Wednesday? Try this again?  I will have him again." @bbprTybttm advised, "Yes, I am game for Wednesday. When should I come up there? Would kind of like to meet you face to face before meeting him as well." The UC and @bbprTybttm agreed to meet face to face prior to sexually abusing the UC's purported nephew. @bbprTybttm provided a long description via text explaining what he wanted to do with the purported boy. This included surprising the 9-year-old child by penetrating the child's anus with his (Defendant Day's) tongue and holding down the child's legs so the child could not stop @bbprTybttm from orally penetrating the child.  Defendant Day never followed through on plans to meet the UC in Washington, D.C.

**The Arrest**

On Friday, March 29, 2024, an arrest warrant was signed charging the defendant with Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b), Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). On Thursday, April 4, 2024, a grand jury in the U.S. District Court for the District of Columbia returned an indictment charging the defendant with the same offenses.

On April 10, 2024, members of the United States Marshals Service (USMS) attempted to locate the defendant regarding his active arrest warrant.  The defendant was subsequently located sitting in a vehicle registered to him in a parking lot of a barbeque restaurant in California, Maryland at approximately 10:00 a.m. on April 10, 2024.

The members of the USMS approached the vehicle and observed the defendant seated in the driver's seat of the vehicle masturbating while holding and watching a cellular phone. The defendant was ordered out of the vehicle by a member of the USMS and taken into custody pursuant to his active arrest warrant. A member of the USMS then recovered the cellular phone, which had been put down by the defendant while he was taken into custody.[5] Also within the defendant's reach, clearly visible to the USMS, and consistent with the defendant's statements to the UC, was a hypodermic needle filled with suspected crystal methamphetamine. The defendant agreed that the needle and suspected narcotics should be disposed of, and the defendant's vehicle has been returned to the defendant's parents.

On Thursday, April 11, 2024, the defendant made his initial appearance in U.S. District Court for the District of Columbia. On the government's motion, the defendant was held pending a detention hearing, which is scheduled for Wednesday, April 17, 2024. The government now respectfully submits this memorandum in support of its motion for pretrial detention.

## Applicable Legal Standard

Under the Bail Reform Act, if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community," the Court shall order the defendant held pending trial. 18 U.S.C. § 3142(e). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019). As a threshold matter, the government must demonstrate by a preponderance of the evidence that a defendant is a flight risk, *see United States v. Anderson*, 177 F. Supp. 3d 458, 466

---

[5] The USMS could not determine what the defendant was watching as he was masturbating prior to his arrest. The government is in the process of searching the defendant's cell phone.

(D.D.C. 2016) (citing *United States v. Xulam*, 84 F.3d 441, 443 (D.C. Cir. 1996)), and by clear and convincing evidence that he is a danger to the community, *see* 18 U.S.C. § 3142(f).

In determining whether any condition or combinations of conditions will assure the safety of the community, in light of any applicable presumptions, the Court weighs four factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).

Here, because Coercion and Enticement of a Child and Distribution of Child Pornography are crimes of violence involving a minor victim, "[s]ubject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3)(E). This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released"). But even if the defense produces credible evidence, the presumption retains evidentiary weight and is considered by the Court among the Section 3142(g) factors. *See, e.g.*, *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010) ("Even when a defendant satisfies his burden of production, however, 'the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court.' . . . The presumption remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should

ordinarily be detained prior to trial." (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001))); *United States v. Ali*, 793 F. Supp. 2d 386, 388 n.2 (D.D.C. 2011) ("[C]ircuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence.").

In making this determination, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted, and the government may proceed by proffer. *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *see also United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device. *See Smith*, 79 F.3d at 1210; *Williams*, 798 F. Supp. at 36.

<u>**Argument**</u>

For reasons that follow, the defendant poses an unmitigable risk to community safety, particularly to children. Because there are no conditions of release adequate to reasonably assure community safety or, this Court should order the defendant detained pending trial.

### A.  Nature and Circumstances of the Charged Offenses

The defendant's alleged conduct in this case is extremely harmful and dangerous to the community. As detailed above, the nature and circumstances of offenses that went for over a year make clear that this factor weighs heavily in favor of detention. This defendant attempted to coerce, entice, and prepare an 11-year-old child for violent, horrifying sexual abuse by two adult men. The defendant repeatedly told the UC how he wanted and intended to sexually abuse

children, particularly boys.  The defendant's criminal conduct involves the sexual exploitation of the most vulnerable members of our community – very young children.  In addition to discussing the sexual abuse of who he believed to be real, young, pre-pubescent children, this defendant also discussed his child pornography collection and distributed child pornography to an undercover law enforcement officer.

"Child pornography depicts pictorial evidence of physical sex abuse against and exploitation of children and the production and distribution of such contraband carries a multitude of harms." *United States v. Galarza*, No. 18-MJ-146 (RMM), 2019 WL 2028710, at *6 (D.D.C. May 8, 2019) (Howell, C.J.) (reversing magistrate court's release order); *United States v. Nickelson*, No. 18-MJ-102 (GMH), 2018 WL 4964506 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same); *United States v. Blanchard*, No. 18-MJ-101 (GMH), 2018 WL 4964505, at *4 (D.D.C. Oct. 15, 2018) (Howell, C.J.) (same).  Children captured in images and videos depicting their sexual abuse are significantly harmed at the time that the images and videos are created, and they are re-victimized and re-traumatized every time an individual, like this defendant, views and shares these images for his own sexual gratification and for the sexual gratification of others.  *See Galarza*, 2019 WL 2028710, at *6 (noting that "'the perpetual nature of child pornography distribution on the Internet causes significant additional harm to victims,' [who] 'live with persistent concern over who has seen images of their sexual abuse' and how those images are being used to cause additional harm.'" (quoting U.S. SENT'G COMM'N, FEDERAL CHILD PORNOGRAPHY OFFENSES (Dec. 2012) at vii); *Nickelson*, 2018 WL 4964506, at *4 (same); *Blanchard*, 2018 WL 4964505, at *4 (same).

The seriousness of the offense is also reflected by Congress's judgment that those charged with distributing child pornography and coercing and enticing a child (or attempting thereto)

should be presumed detained pending trial, *see* 18 U.S.C. § 3142(e)(3)(E).  Additionally, such defendants are subject to significant mandatory minimum sentences: a five-year mandatory minimum term of imprisonment upon a conviction of Distribution of Child Pornography, *see* 18 U.S.C. § 2252(b)(1), and a ten-year mandatory minimum term of imprisonment upon a conviction of Coercion and Enticement of a Minor, *see* 18 U.S.C. § 2422(b).

The defendant's conduct in this case was particularly egregious in that it involved the coercion and enticement of a purported 11-year-old child, as well as the distribution and possession of videos depicting the violent sexual abuse of prepubescent children.  As detailed the above, the defendant was extremely detailed in directing the UC to coerce and entice his purported child.  The defendant went so far as to tell the UC to show explicit photographs to the child and to tell the child about the abuse that the defendant was prepared to commit.  The defendant encouraged the UC to sexually abuse his purported 11-year-old son, and very clearly understood the trusting nature between a child and his parent, and sought to take advantage of this very relationship.

Further, the defendant stated over and over that this was not "fantasy" for him; rather, he clarified to the UC that he fully intended to follow through with the abuse of a young boy.  As detailed above, the videos, possessed and shared by the defendant for purposes of his own sexual gratification, depict extremely young and vulnerable children being raped by adult men.  Finally, when the defendant was arrested at approximately 10:00 a.m. on a Wednesday morning, he was in his vehicle masturbating while watching likely pornography – possibly child pornography – on his cellular phone, with a hypodermic needle full of suspected crystal methamphetamine next to him. This defendant has engaged in extremely dangerous behavior and is a danger to the community.

**B.  The Weight of the Evidence Against the Defendant**

The second factor to be considered, the weight of the evidence, also weighs heavily in favor of detention.  The evidence against the defendant in this case is extremely strong.  As detailed above, the defendant discussed his sexual interest in children at length, over the course of many months, in much detail with an undercover law enforcement officer.  The defendant was extremely explicit in what he wanted to do to young boys and then purposefully distributed a video to the UC depicting the sexual abuse of a young boy, consistent with what he himself wants to do.

Law enforcement was subsequently able to link the accounts with which the defendant first contacted the officer to the defendant in multiple ways.  Law enforcement executed a search warrant on the defendant's residence in May 2023.  Consistent with what he had been discussing with the UC, the defendant's residence had likely narcotics and paraphernalia within it. Additionally, law enforcement discovered child pornography on the defendant's electronic devices within the residence, including on a laptop that was clearly operated and used by the defendant.

While some judges in this Court have indicated that this factor should be given less weight, in *United States Blackson*, following a thorough review of the text of Section 3142 and decisions analyzing this factor, then–Chief Judge Howell found that "the weight of the evidence should not automatically be weighed less than the remaining statutory pretrial detention factors."  No. 23-CR-25 (BAH), 2023 WL 1778194, at *8 (D.D.C. Feb. 6, 2023) (Howell, J.).  Instead, "the weight of the evidence against [a] defendant [should] be weighed as all factors are—in accordance with the specific facts of this case—to determine whether pretrial detention is appropriate." *Id.* at *10.  In an unpublished opinion, the D.C. Circuit affirmed then–Chief Judge Howell's decision. *United States v. Blackson*, No. 23-3020, 2023 WL 2663034 (D.C. Cir. Mar. 28, 2023).  The Second Circuit reached the same decision after a thorough and careful analysis of the issue. *United States v. Zhe Zhang*, 55 F.4th 141, 149–150 (2d Cir. 2022).  This Court should follow *Blackson* and

*Zhang*; this factor should be given no less weight than any other factor, and the the defendant should be detained pending trial.

### C.  The History and Characteristics of the Defendant

Although the defendant has no known criminal history, he has admitted to the undercover officer in this case that he has a long-standing sexual interest in children and that he is extremely willing and excited to act upon this sexual interest.   The defendant also asked the undercover officer if he would "share" his purported prepubescent son, and later his purported brother's stepson, in an apparent attempt to engage with the officer in acts of sexual abuse against these purported young boys.

In addition, the defendant sought to conceal his identity, his illicit conversations, and his illegal distribution of child pornography by using an end-to-end encrypted messaging application. He expressed hesitation about being caught by law enforcement and was savvy enough to avoid sending voluminous child pornography files.

Finally, the circumstances of the defendant's life and recent arrest are concerning and demonstrate extreme dangerousness to the community.   This defendant went from having a seemingly stable life and government job, to using illegal narcotics, defaulting on his rent, and being evicted.   For the last several months, the defendant has been living with his parents in Southern Maryland, without consistent work, and "slamming," or injecting crystal methamphetamine on a regular basis.   According to the defendant's own words, he uses his drug of choice when he is "perving."  When the defendant was arrested on April 10, 2024, he was in his vehicle, not far from his parents' home.   At 10:00 a.m., the defendant was observed masturbating, while watching likely pornography – possibly child pornography – on his cellular phone.   The defendant had a needle with suspected crystal methamphetamine next to him, ready to be used.

Given the nature of the allegations here, the defendant's decline and drug addiction makes him extremely dangerous to the community.

### D.  The Nature and Seriousness of the Danger to any Person or the Community

The facts and evidence in this case establish that the defendant poses a grave danger to the community.  As discussed above, twice, this defendant actively sought out who he believed to be a father with access to a prepubescent son that he was actively sexually abusing.  The defendant engaged in extensive and detailed conversations about how the purported father abused his child, and the defendant actively sought to be involved and to participate in this sexual abuse.  The defendant clarified over and over that he truly wanted and intended to sexually abuse young boys. The defendant is a true and active threat to real, live, young children.

In addition, the distribution of child pornography presents a serious danger to the community because it results in severe mental, emotional, and physical trauma to the children who are victimized by offenders such as the defendant, who seek to achieve sexual gratification through viewing and sharing of images depicting the sexual abuse of children.  The defendant, as a collector, consumer, and trafficker of this abhorrent material, furthers the demand for new material depicting the graphic sexual exploitation and sexual abuse of vulnerable children.  It is precisely "[t]hese significant harms and dangers [that] animated the Congress to create the statutory presumption of detention in these cases." *Galarza*, 2019 WL 2028710, at *7; *Nickelson*, 2018 WL 4964506, at *5 (noting also Congress's creation of significant statutory mandatory minimum penalties); *Blanchard*, 2018 WL 4964505, at *4 (same).

As described above, the defendant here has not only engaged in the distribution of sadistic child pornography material depicting extremely vulnerable young children being raped by adult men but has also sought out others who share his sexual interest in children.  According to the

defendant's statements to the UC, he has encouraged others to sexually exploit children by discussing and sharing child pornography and has attempted to meet other offenders who have access to children so that they could sexually abuse the children together.

The defendant did not have any moral issue sharing hardcore child pornography with a stranger.  He knew his conduct was illegal, and only expressed hesitation about being caught by law enforcement.  The totality of his conduct and personal circumstances demonstrates that he is an unmitigable danger to the community.  There is no condition or combination of conditions that could reasonably assure community safety or if he were he to be released.  This Court should detain him pending trial.

### Conclusion

For the foregoing reasons, the government respectfully requests that this Court detain Defendant Brian Day pending trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

Dated: April 16, 2024          By:          /s/ *Rachel Forman*
Rachel Forman
VA Bar 89169
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia
601 D Street, N.W.
Washington, D.C. 20530
(202) 805-1261
Rachel.forman2@usdoj.gov